*Cates & Lindsey* for plaintiff; *Morehead & Reed and Hardin* for defendants.

---

CHANCERY.

Case 38.

January 3.

Case stated.

# Fountain Ferry Turnpike Road Company *vs* D. and C. Jewell.

## ERROR TO THE LOUISVILLE CHANCERY COURT.

### Corporations. Chancery jurisdiction.

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

IN February, 1837, an act was passed for the incorporation of the Fountain Ferry Turnpike Road Company, with a capital of $8,000, but to be increased by the company if necessary, for the purpose of making an artificial road from the suburbs of Louisville to the Ohio river at Pope's farm, and with the privilege of taking a perpetual lease of the Fountain Ferry, understood to be at its terminus. The complainant, David Jewell, with several others, was appointed a commissioner to open books and superintend subscriptions of stock; and upon forty shares of $100 each being subscribed, any three of the commissioners were authorized to close the books, and call a meeting of the subscribers for the purpose of electing a President and three Directors. The company was authorized to erect one gate, and to charge such tolls only as would pay expenses, and keep the road in repair, with the power of dis-

continuing at any time the charge of tolls for a specific period, and again resuming it. By the 18th section of an act of 1835, "to incorporate the Springfield and Bardstown Turnpike Road Company," and which is adopted as a part of the charter now under consideration, the company was allowed two years from its organization, to commence the road, and five years after its commencement, to complete it.

In April, 1837, books were opened for subscription of stock, as provided in the charter, and about forty three shares were subscribed, of which the complainants, (jointly as is to be inferred,) subscribed six, and without closing the books, or calling a meeting for electing officers, the further subscription was adjourned indefinitely. In February, 1846, the books were again opened for subscription, under the supervision of three commissioners, and one share having been subscribed, the books were closed, and a meeting for election of officers called by an order signed by the three commissioners. A meeting and election were accordingly held on the 7th of March, 1846, at which the complainant, D. Jewell, with one or two others, though present, refused to cooperate, and on the 11th of March, 1846, this bill was filed. The complainants, besides stating most of the foregoing facts, alledge that at the time of subscribing, they lived and owned land on the proposed road, and were induced to subscribe in the expectation of benefit from that fact, and by the promise of the Popes, claiming to own the Fountain farm and ferry, that they would give a lease of the ferry to the company, the profits of which would produce a dividend upon the stock; but that they did not own the ferry, which is alledged to have been abandoned for a number of years, and never granted to the Popes. And they charge that they, the complainants, had considered the project of making the road abandoned, from the time of making their subscription, and of the first certificate that forty shares were subscribed; and that it was in fact abandoned, as they believe and charge, because the Popes could not by their promises, &c., induce a sufficient subscription of stock, &c. And they say, that under the belief that

the project was abandoned, they have sold their land on the road, and that the complainant, C. Jewell, has long since removed to a distant county, and the complainant, D. Jewell, expects shortly to remove, and they own no land on the road. They state that one of the Popes who had promised the lease of the ferry, has departed this life, and his interest in the Fountain ferry farm has been sold; and that the Popes did not, and do not own the ferry, and cannot make the promised lease, and that it is a fraud upon the complainants now to elect a President and Managers under said old abandoned subscription, and to attempt to make them contribute to make a road for the benefit of others, from which they can derive no profit, and under a subscription obtained by fraud and misrepresentation as aforesaid. They further charge, that two of the subscribers, (for four shares,) are insolvent; that the road is three miles in length, and will cost $15,000; that it is not possible to obtain a sufficient subscription to make it; that they do not believe the company intend in good faith to make it, but only to grade it for the benefit of the few stockholders residing on it, and then abandon the work; and that they have offered to surrender their stock, but that it was refused by the company, with the acknowledgment that it ought not, in conscience, to be coerced, but with the intimation that it would be.

They make all the subscribers defendants, and pray that the said corporation be dissolved, and the said subscription held for naught; that they be relieved from said subscription; that the said President and Managers be perpetually enjoined from contracting to make said road, and from collecting said subscription—and for general relief.

Upon a demurrer to the bill, the Chancellor correctly decided that a Court of equity has no jurisdiction to annul or revoke a charter, and that the alledged misrepresentation as to the proprietorship of the ferry, furnished no ground for absolving the complainants from their subscription, since neither the corporation, nor all, nor most of the other corporators were participants therein, and the contract was with the company, and

*Courts of equity have no power to annul or revoke charters.*

not with the Popes; but being of opinion that the Managers, as trustees for the corporation, were under the control and supervision of the Chancellor, to prevent an abuse of the discretion confided to them, and assuming upon the face of the bill, that after deducting the subscription of insolvents, the available subscription was less than $14,000—that $15,000 would be required to make the road, and that there was no hope or rational prospect of obtaining any additional subscription, he concluded that it would be a most wilful waste of the means of the corporation, and a gross abuse to their prejudice of the powers confided to the Managers, to undertake the making of the road with such inadequate means, and he retained the bill for the purpose of enjoining the Managers from collecting the subscription, if such should prove to be the facts at the hearing.

The answer filed for the corporation relies upon the proceedings just stated, and the legality of the election, and among other things, denies the inability of one of the alledged insolvents to pay his subscription; denies the impracticability of obtaining a sufficient subscription to complete the road; alledges that it is the intention of the company to complete the road, and not merely to grade it. And it is further alledged that there was no intention to call upon the complainants, or any other subscribers, for payment until a sufficiency of stock should be subscribed to complete the road according to the charter, which the defendants aver can be done. At the hearing on the 5th of March, 1847, it was decreed, upon bill and answer, that the defendants be enjoined from proceeding in any way to collect the subscription of the complainants, and that each party pay their own costs. "But if the defendants can show, in six months, that they have obtained the means of making the said road, by subscription or otherwise, in the manner contemplated by the charter, they shall have leave to do so, and open this decree, and control is retained over the decree for that purpose."

It appears, that on the 9th of July, the Louisville Chancery Court, in which this decree was rendered, took a recess, and did not sit again for general business,

*Marginal notes:*

FOUNTAIN FERRY
T. R. COMPANY.
*vs*
D. & C. JEWELL.

Answer and decree of the Chancellor.

Proposition to file an amended answer rejected.

until the 10th day of September following, though it was opened for special business on the 20th and 27th days of July, the 11th of August and the 2d of September. On the 10th of September its regular session was re-commenced, and in the same term, on the first day of October, the defendants offered to file an answer showing that in April, the subscription had been increased to $8,000; that in the course of the summer, proposals had been issued and a contract made for grading and gravelling the road; that calls had been made on the subscribers, and between $1,400 and $1,500 collected; that a considerable portion of the road had been graded and gravelled, and that the subscription was sufficient for its completion. This answer was not allowed to be filed, and the company prosecute a writ of error to reverse the decree of injunction.

The Chancellor cannot, at the instance of one, or of a minority of corporators, interpose to prevent an appropriation of the corporate fund to the purposes for which it was raised, against the decision of a majority of the managers appointed under the charter, whatever he might do at the instance of the majority.

If it be conceded that the Chancellor may interpose upon the application of corporators, to prevent a diversion of the corporate fund from the objects contemplated by the charter, to other objects not authorized by it, we are still not prepared to admit that he can interpose upon the prayer of one or a minority of the corporators, to prevent an appropriation of the funds to the identical object for the accomplishment of which the corporation was instituted. The question whether the object intended to be accomplished, is worth the cost and expense necessarily involved, is one which each individual may determine for himself before he subscribes for stock. But when he has actually subscribed, he submits this question to the decision of the company or its managers, under the provisions of the charter, and in the absence of fraud, has no appeal from that decision. It may be, that upon the application of the great mass or a majority in votes and interest of the corporators, avowing their judgment and determination that the objects of the association should be abandoned as worthless or unattainable, the Chancellor might, if it were necessary, interpose to restrain the managers from a further expenditure of money in its prosecution, until the corporators might, in some legal mode, obtain a dissolution of the corporation or a change in the body of

managers. But so long as the corporation keeps within the limits of its charter, we do not perceive the principle which would authorize the Chancellor, upon the application of one or a few of its members, and in pursuance of their opinions or wishes, or on the ground of his own judgment of expediency, to restrain the action of the body pursuing in obedience to its own will and judgment, its own specific and authorized objects, in such time and manner as might be dictated by its own convenience and allowed by its charter. The managers might unquestionably be restrained from committing or continuing a fraud upon all, or a few, or one of the corporators; and there might be a special equity entitling one or more corporators to be relieved from their membership and the burthens attached to it. This would, in effect, be a rescission of the contract between the individual and the corporation, which might, perhaps, be either absolute or conditional. But this power of preventing or relieving from a particular injustice or oppression, does not involve nor sanction the power of interfering with the general movement and capacity of the corporation, for the attainment of its legitimate ends.

The sympathy generally subsisting between the constitutional and the representative bodies, will, in the main, furnish a sufficient guarantee against the collection and expenditure of the funds of the individual corporators, in a manner oppressive to the majority, or for purposes disapproved of by them. But so far as the action of the corporation in the direct accomplishment of its authorized objects is concerned, the question of expediency, of practicability, of extravagance or of prudent economy, must be left to be decided by the managers and the corporators. And we cannot admit that the apprehension of an individual subscriber, that if he pays his subscription to the corporation, it will be wastefully used by the company, is a proper ground for absolving him from his undertaking to pay, and much less, when the alledged wastefulness is expected to consist, not in a diversion of the funds to purposes foreign to the objects of the incorporation, but in their appropriation to those

objects, and the Chancellor is informed by the malcontent individual or minority, and called upon to decide that the object is unattainable with such means as the corporation has or can get, and therefore, that the appropriation of such means as it has, will be wasteful extravagance.

In the charter before us, the corporation was expressly authorized to increase its capital as the object to be accomplished might require. . Conceding that the subscription obtained before the bill was filed, was insufficient for the useful completion of the work, and that it would have been improvident to commence it until subscriptions sufficient for its useful prosecution and completion, should be obtained, still the impracticability of obtaining such subscription was, from the nature of the thing, wholly conjectural, and the allegation of an intention to expend the sum already subscribed, without adequate means of making the work useful, had no basis in any act done or threatened, and being unsupported by any probable motive, was in itself, improbable. If, therefore, the Chancellor had the unquestionable power to prevent the collection and expenditure of the money subscribed, on the ground that its appropriation before a sufficient sum should be subscribed, would be a wasteful extravagance and an injurious abuse of discretion, his interposition for such a purpose, would scarcely seem to be justified by these allegations of the bill, and if they should be deemed sufficient to authorize such an exertion of his power, its proper object of securing the corporators from the wasteful use of their funds by their managers, would seem to limit his interposition to an injunction against the commencement of the work until an adequate subscription should be obtained. But even an injunction thus restricted, granted upon the application of one or two corporators, would, as we believe, be unauthorized by any precedent. It would be imposing a condition upon the action of the corporation, not imposed by its charter, and might, perhaps, prevent its compliance with the condition actually imposed with regard to the time of commencing and completing the work.

So far, therefore, as the opinion overruling the demurrer, and the decree finally rendered, imply a power in a Court of equity, upon the prayer of one or two corporators, to restrain the corporation, or its managers without its assent, from the commencement or prosecution of the work for which they were incorporated, or from collecting the subscriptions for that purpose, of any or all of the subscribers, on the ground that the funds subscribed were insufficient to complete it, and that enough could not be obtained or had not been at the hearing, we do not admit the existence of such power; and if the injunction as finally decreed, rested upon this power alone, we should feel bound to reverse the decree. But we are of opinion that there are grounds of equity applicable to the case of the complainants, and to their relations with the corporation, on which the decree absolving them in effect, from the payment of their subscription, is justified and should be affirmed.

It is apparent from the charter, as well as from the pleadings in this cause, that the only certain benefit expected to be derived from the expenditures upon the road was, that which those who resided or owned land near it, would find in the increased facilities of travel and transportation to the river at one terminus, and to the city of Louisville at the other. There was to be no profits from the tolls on the road, and not only was the acquisition of the ferry unsecured and uncertain, but any prospect of profit from that source, was remote and entirely contingent. The advantage to arise from the construction of the road being thus restricted, the inducements to a subscription were also confined to those who resided or owned land upon or near it. And although the continuance of the obligation of an actual subscriber did not depend upon his remaining in a condition to derive the expected benefit, or upon the continued application to him, of the same inducements which had led to his subscription; yet it is apparent that if at the time when the first subscriptions were obtained, the subscribers, and the commissioners acting for them, had evinced a disposition to go on with the project of making the road, any subscriber whose interest

*Where the subscription of stock under a charter was deemed inadequate to the purposes for which it was subscribed, and no action taken for upwards of nine years to appoint Directors or to appropriate the fund subscribed according to the charter, and the object contemplated by the charter abandoned—Held that such of the subscribers as on the faith of the abandonment, changed their circumstances & were no longer interested in the object, could not be compelled to pay their subscription.*

or inclination might lead him to make a sale of his land on the road, would have taken into consideration his obligation to contribute to the construction of this road, and would have had at least the opportunity and the inducement to charge upon the price of the land some compensation for the benefit which it was to derive from his future payments, or might, upon due estimate of the burthen which he had incurred, and of any compensation which he might obtain, have determined not to sell.

But the great delay of the subscribers and the commissioners, to take any step or do any act indicative of an intention to prosecute the objects of the subscription, was well calculated to induce the belief that the project was abandoned by all concerned. The subscription originally obtained was confessedly inadequate. No attempt to obtain further subscription or to organize the company, was made for nine years and eleven months. The complainants alledge that they considered the project as having been abandoned from the time the subscription was adjourned, in 1837. They aver that it was, in fact, abandoned because further subscriptions could not be obtained. And they say that, under the belief that it was abandoned, they sold their land, &c. These allegations are not denied either by the individual corporators, all of whom are made defendants, nor by the corporation itself, for which an answer was put in, and the averment in that answer, that one of the complainants was present when the election was ordered, is not proved. The clear inference from the facts thus alledged and admitted is, that the complainants obtained no compensation for the benefit which their land might derive from the road, or for any burthen which might rest upon them for securing that benefit, and that if now compelled to pay, it will be a burthen for the benefit of others, without any advantage, past or future, to themselves; and that this condition has been produced by the long delay and inaction of the subscribers and their agents, and by the general understanding of all, that the project was abandoned, whereby the complainants had no reason to suppose that it was to impose any burthen upon them, or to produce any benefit to their land or its

future proprietors, and were thus subjected to the entire loss of the consideration on which their subscription was founded. It is true that as no time was limited in the charter for the organization of the company, this long suspension of all action towards that end, may not have been a cause of forfeiture; and if it were, the Chancellor would have had no jurisdiction to pronounce judgment of forfeiture. The subscribers and the commissioners may, therefore, have had the right to proceed to the organization of the company in March, 1847, and at any time before. But the fact that they were authorized thus to proceed and to bind even those subscribers who, without other cause of objection than a change of opinion, might oppose the proceeding, leaves open the question as to the equity of any particular subscriber to be relieved from his subscription in consequence of a change of circumstances induced by the conduct of the corporators and their agents, whereby all the expected advantage from the subscription has been lost to him, and its enforcement against him would be the imposition of a burthen purely for the benefit of others. As to such subscriber, the enforcement of his subscription is obviously unjust and oppressive, and we think the organization of the company may, so far as it had that object in view, be regarded as a fraud upon him.

We are of opinion, therefore, that on this ground the complainants have a clear equity to be absolved from the burthen of their subscription.

Wherefore, the decree is affirmed.

*Thruston & Pope, Duncan & Ripley* for plaintiffs; *Guthrie* for defendants.